# EXHIBIT "A"

**FILED**

**JUNE 18, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| TARAS LYSSENKO, | |
| Plaintiff, | |
| v. | Case No. 07 C 6678 |
| INTERNATIONAL TITANIUM POWDER, LLC and STANLEY BORYS, | Judge Robert W. Gettleman |
| Defendants. | Magistrate Judge Martin C. Ashman |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Taras Lyssenko ("Lyssenko"), by his attorneys, Anthony J. Carballo and Gia F. Colunga of Freeborn & Peters LLP, for his First Amended Complaint against Defendants International Titanium Powder, LLC ("ITP") and Stanley Borys ("Borys"), states as follows:

### Nature of the Case

1.      Lyssenko brings this action seeking redress for the substantial monetary and other injuries suffered as a result of the unlawful conduct of ITP and its CEO Borys. Lyssenko entered into an agreement with ITP, pursuant to which Lyssenko was to receive payment in an amount equal to five percent of all government funds obtained for ITP through Lyssenko's government relations and marketing efforts. ITP sought to renege on this agreement and to avoid Lyssenko's inquiries regarding improper conduct at ITP, so it terminated Lyssenko in August of 2007. ITP has since failed to honor the terms of its agreement with Lyssenko, which has caused Lyssenko substantial monetary damages. Moreover, Lyssenko has suffered damages as a direct result of ITP's wrongful retaliatory discharge. Furthermore, Lyssenko is also seeking damages and injunctive relief as a result of the defamatory and disparaging statements made about him by Borys and others at ITP.

### Parties

2.      Plaintiff Lyssenko is a citizen of the State of Michigan and formerly worked for ITP as its Director of Government Relations and Business Development.

3.      Defendant ITP is an Illinois limited liability company with its principal place of business located at 20634 W. Gaskin Drive, Lockport, Illinois 60441. ITP includes the following six members: (i) James Kurtenbach, citizen of Nevada, Iowa, (ii) Grant Crowley, citizen of Chicago, Illinois, (iii) Donn Amstrong, citizen of Waukesha, Wisconsin, (iv) Arthur Wong, citizen of Chicago, Illinois, (v) Richard Anderson, citizen of Clarendon Hills, Illinois, and (iv) Defendant Borys, citizen of Elmhurst, Illinois. ITP is in the business of producing low-cost titanium and titanium alloys.

4.      Defendant Borys is a citizen of Illinois, residing at 372 N. Walnut Street, Elmhurst, Illinois 60126. Borys is the CEO of ITP.

### Jurisdiction And Venue

5.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a).

### Statement of Facts

7.      Lyssenko is a former army ranger for the United States military. Since resigning from his post, Lyssenko has continued to serve his country in many ways. For instance, on behalf of the National Museum of Naval Aviation, Lyssenko retrieved dozens of WWII airplanes from the depths of Lake Michigan, which were downed during training sessions. Lyssenko also spear-headed the congressional bill authorizing payment for such retrievals. Additionally,

Lyssenko played a role in several Governmental Accountability Office ("GAO") investigations to rid the government of corruption. These efforts and others lead Lyssenko to his career in government relations. Lyssenko's unique background and experiences have enabled him to work effectively in the government relations and business development arenas.

**A.    The Lyssenko-ITP Agreement.**

8.    In 2002, ITP approached Lyssenko with a new cause to support. In particular, ITP's Chairman of the Board, Grant Crowley ("Crowley"), and ITP's CFO, Arthur Wong ("Wong"), informed Lyssenko about ITP's development of a process to produce low-cost titanium and titanium alloys. Titanium is a far more superior metal than both steel and aluminum for military purposes, but had been too costly for the government to employ on a large scale. ITP sought to change the cost barrier through its technology, but needed funding to complete its research.

9.    Because of Lyssenko's background and past government relations work, ITP asked Lyssenko to assist it in obtaining government funding. ITP sought any and all government funding, but ultimately hoped that the government would pass a Defense Production Act Title III action, through which the government decides that market forces are not developing a necessary technology quick enough, so it provides funds for the technology's development and in return may buy the goods produced by that technology at a lower cost.

10.    In return for Lyssenko's government relations and marketing efforts, ITP offered to pay Lyssenko compensation in an amount equal to five percent of all government funding obtained by ITP through Lyssenko's efforts.

11.    Because Lyssenko agreed that the production of low-cost titanium was a worthy cause and the terms of the agreement were fair, Lyssenko accepted ITP's offer.

- 3 -

12.    Consequently, ITP and Lyssenko entered into an oral agreement for nonexclusive at-will employment for an indefinite duration. The terms of this agreement required Lyssenko to lobby for government funding for ITP and required ITP to pay Lyssenko compensation in an amount equal to five percent of all government funding obtained by ITP through Lyssenko's efforts.

**B.    Lyssenko's Initial Government Relations and Business Development Efforts.**

13.    Lyssenko began his government relations efforts immediately, contacting those members of Congress and various governmental entities that were likely to support low-cost titanium.

14.    For instance, Lyssenko contacted the offices of Senators Richard Durbin and Peter Fitzgerald and Representatives Judy Biggert, Roscoe Bartlett, Jerry Weller, Bill Young, Jerry Lewis, Duncan Hunter, Don Manzullo and others. Lyssenko also worked with many governmental entities, such as the Defense Advanced Research Projects Agency ("DARPA"), Advanced Technology Program of the National Institute of Standards and Technology ("APT NIST"), the Armament Research Development and Engineering Center ("ARDEC"), the Oak Ridge National Laboratory ("Oak Ridge"), and the Office of the Secretary of Defense ("OSD").

15.    Realizing that he could obtain government funding for ITP more easily if ITP's business development flourished, Lyssenko began taking an active role in ITP's business development as well. He made contacts with titanium consolidators and fabricators and their government partners, such as ADMA Products, Army ManTech Technical Objectives Committee, Webster-Hoff, LMC Press, Ametek, Oak Ridge, and Boeing Company. These efforts lead to Boeing Company, among others, purchasing ITP's titanium. He also began attending conferences in the titanium industry in order to promote ITP, such as the conferences

- 4 -

organized by the International Titanium Association and AeroMat. Additionally, Lyssenko began hosting and conducting titanium consolidation and fabrication meetings where presentations were made by DARPA, Army, Navy, Air Force, Department of Defense prime contractors, Department of Energy, and fabricators.

16.    ITP recognized Lyssenko's business development efforts and thus gave him the title of "Director of Government Relations and Business Development."

17.    From 2002 to February 2004, Lyssenko took these actions without receiving any compensation from ITP because, per the Lyssenko-ITP agreement, ITP had no obligation to pay Lyssenko until ITP received government funding through Lyssenko's lobbying. Only if and when Lyssenko obtained government funding for ITP did the agreement require ITP to pay Lyssenko an amount equal to five percent of the funds received.

**C.    The February 2004 Modification to the Lyssenko-ITP Agreement.**

18.    In or around February 2004, Lyssenko's government relations and business development efforts paid off, and ITP received its first government funds: $1,700,000 from Congress.

19.    As a result, Lyssenko sought his agreed to compensation of an amount equal to five percent of the funds received by ITP.

20.    ITP had little available capital at that time, however, and could not afford to provide Lyssenko with the full five percent due.

21.    ITP and Lyssenko therefore mutually agreed to modify their agreement.

22.    The terms of this modified agreement still required Lyssenko to perform government relations and marketing for government funding for ITP, and still required ITP to pay Lyssenko compensation in an amount to five percent of all governmental funding obtained.

But the modified agreement permitted ITP to pay down the total amount owed to Lyssenko via installment payments of a monthly salary of $9000, health insurance, and FICA while ITP's cash flow remained low. ITP's ultimate obligation to pay Lyssenko an amount equal to five percent of all government funding did not change however.

**D.    Lyssenko Continued to Increase ITP's Governmental Funding, but the Relationship Between Lyssenko and ITP Worsened.**

23.    The government funds secured by Lyssenko continued after February 2004.

24.    From 2004 to 2006, Lyssenko obtained funding for ITP through Congress, DARPA, ARDEC, and Homeland Security, totally approximately $6,575,000.

25.    Additionally, due to Lyssenko's efforts in 2006, ITP received $3.55 million from Congress in 2007.

26.    Likewise, Lyssenko's government relations efforts in 2006 caused Representative Weller to request funds for ITP in the 2007 defense appropriations bill, with the $968,000 in pretax funds provided by ARDEC or Army RDE Comm.

27.    Lyssenko also secured a $630,000 Illinois Economic Development for a Growing Economy ("EDGE") Grant for ITP in 2007. This EDGE Grant provides ITP with income tax rebates, training funds, and other monetary benefits.

28.    Moreover, Lyssenko got closer to obtaining a Defense Production Act Title III action for ITP. After years of discussing ITP's titanium development with the OSD and Senator Durbin, in 2007, both agreed to seek a Title III action for ITP in Congressional defense appropriations bills. OSD already was working on its budget recommendations for 2009, but informed Lyssenko that it would recommend the Title III in 2009 for $50 million to $150 million. Because Senator Durbin knew that OSD was moving forward with the Title III in 2009, Senator Durbin agreed to request a smaller-scale Title III for $5 million to $10 million in the

2008 defense appropriations bill. Durbin did so, and the 2008 defense appropriations bill requests the President of the United States to approve a $5 million Title III for ITP. The President will review the bill at the beginning of the 2008 year. Once it is approved, ITP will receive the Title III funding.

29.  Throughout the years, Lyssenko also secured government funds that benefited ITP, but ITP was not the direct recipient of said funding.

30.  In total, Lyssenko has secured approximately $16.75 million in government funds directly for ITP, secured additional funds that benefited ITP indirectly, and as a result of Lyssenko's efforts ITP should receive further direct funding in 2009 with the OSD's planned Title III action for $50 million to $150 million.

31.  Despite Lyssenko's hard work, dedication, and successful efforts on behalf of ITP, Borys and others at ITP began criticizing him and seeking ways to avoid the five-percent agreement.

32.  For instance, in 2003, Lyssenko overheard ITP Board Chairman Crowley tell lobbyist Mark Ruge on the telephone that after Lyssenko establishes the foundation for the Title III action, ITP will fire Lyssenko and permit Ruge to complete the Title III action. Lyssenko overheard this telephone conversation while standing outside of Crowley's office.

33.  Likewise, James Kurkenbach ("Kurkenbach"), ITP's venture capitalist manager, expressed frustration when discussing the five-percent agreement with Lyssenko in or about May 2007.

34.  In June and July of 2007, Borys and Crowley both displayed frustration when Lyssenko questioned the legality of ITP's decision to award construction projects to Kurkenbach's friend, who on information and belief charged ten percent more than the market

rate, rather than utilizing the public-bidding system. Likewise, they displayed frustration when Lyssenko questioned whether ITP had reported to ITP investors and board in a full and truthful manner its decision to award construction projects to Kurkenbach's friend and the financial consequences of that decision.

35.     Because the construction projects were funded in part by the government, Lyssenko questioned whether the public-bidding process, which ITP's engineer had intended to use, was mandatory. Moreover, Lyssenko believed that the ITP investors and board deserved a full financial report revealing ITP's decision to award construction projects to Kurkenbach's friend.

36.     Lyssenko raised the issue with Borys first, but he did nothing. Lyssenko then raised the issue with Crowley, and Crowley also took no action. On information and belief, neither Borys nor Crowley fully and truthfully disclosed the financial information to ITP investors and board relating to awarding construction projects to Kurkenbach's friend rather than utilizing the public-bidding system. Instead, both ITP executives dismissed Lyssenko.

**D.     ITP's Termination of Lyssenko and Subsequent Bad Acts.**

37.     On August 3, 2007, ITP terminated the employment of Lyssenko.

38.     Immediately thereafter, Lyssenko sent a demand to ITP for payment of the remaining amount owed to him equal to five percent of all government funds obtained by ITP as a result of Lyssenko's efforts.

39.     ITP has refused to pay the remaining amount owed to Lyssenko.

40.     Thereafter, Borys and others at ITP have been defaming and disparaging Lyssenko's good name throughout Capital Hill, the Department of Defense, and elsewhere.

41.     In September, 2007, Borys told an OSD representative that Lyssenko was terminated because he has "burned bridges" within the government, thus implying that Lyssenko would do a poor job as a lobbyist or any other job relating to government.

### Count I:  Breach of the Lyssenko-ITP Agreement Against ITP

42.     Lyssenko repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 41 as if fully restated.

43.     ITP entered into a valid and enforceable agreement with Lyssenko.

44.     Lyssenko has performed his obligations under the Lyssenko-ITP Agreement by lobbying for ITP, promoting ITP's business development, and securing millions of dollars in governmental funding for ITP.

45.     As a requirement of the Lyssenko-ITP Agreement, ITP promised to pay Lyssenko compensation in an amount equal to five percent of all government funding obtained for ITP through Lyssenko's government relations and marketing efforts.

46.     While ITP provided a portion of the five percent owed to Lyssenko during the course of his employment through the installment payments of the monthly salary, health insurance, and FICA, ITP has failed to pay Lyssenko the full amount equal to five percent of all government funding obtained for ITP through Lyssenko's efforts.

47.     ITP breached the Lyssenko-ITP Agreement by failing to pay Lyssenko the full amount equal to five percent of all government funding he obtained for ITP.

48.     As a direct and proximate result of ITP's breach, Lyssenko has been damaged.

WHEREFORE, Plaintiff, Taras Lyssenko, prays that this Court enter judgment in his favor and against Defendant, International Titanium Powder, LLC, for compensatory damages in

an amount in to be determined at trial, plus prejudgment interest, costs, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count II: Retaliatory Discharge Against ITP

49.    Lyssenko repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 41 as if fully restated.

50.    On August 3, 2007, ITP wrongfully terminated Lyssenko's employment.

51.    The termination occurred just weeks after Lyssenko questioned whether ITP fully and truthfully disclosed to its investors and board its decision not to use the public-bidding system and instead to award construction projects to Kurkenbach's friend – who on information and belief charged ten percent more than the market rate.

52.    Because ITP investors and board deserve a full and truthful financial report from ITP, Lyssenko properly questioned whether ITP had reported to its investors and board the decision not to use public-bidding process, which ITP's engineer had planned to use, and the financial consequences of that decision.

53.    In June or July 2007, Lyssenko first questioned Borys about ITP's disclosure to its investors and board regarding hiring Kurkenbach's friend for construction projects, even though he on information and belief charged ten percent more than the market rate, and choosing not to use the public-bidding system.

54.    After explaining to Lyssenko that there is a "golden rule, those with the gold make the rules, and Kurkenbach has the gold," Borys dismissed Lyssenko.

55.    Lyssenko then raised the same issue with Crowley, but Crowley did not appreciate Lyssenko questioning him about the financial disclosures and public bidding and angrily replied "all you do is complain."

56.    Lyssenko reminded Crowley of his duty to the Board and to the investors to conduct the business properly and to disclose financial transactions in a full and truthful manner, but Crowley took no action.

57.    On information and belief, ITP did not disclose to ITP investors and board, in a full and truthful manner, the financial information relating to awarding construction projects to Kurkenbach's friend rather than utilizing the public-bidding system.

58.    ITP, Borys, and Crowley knew that Lyssenko was familiar with GAO investigations and was not afraid to report corruption to the authorities.  For instance, they knew that Lyssenko had played a role in past GAO investigations and had questioned ITP's human-resources department about the propriety of ITP's time records and bills to government and business contractors.

59.    ITP terminated Lyssenko in retaliation for Lyssenko's inquiries and challenges to Borys and Crowley concerning ITP's financial disclosure to its investors and board of the decision to award ITP construction projects to Kurkenbach's friend rather than utilizing the public-bidding system

60.    Public policy favors full disclosure and truthfulness in financial reports to investors and company boards.

61.    The discharge of Lyssenko in retaliation for his inquiries to ITP concerning the lack of disclosure to ITP investors and board regarding the public-bidding process and award of business to Kurkenbach's friend violates a clear mandate of public policy.

62.    ITP's conduct demonstrated willful and reckless disregard for clear public policy and warrants the imposition of punitive damages.

63.   As a direct and proximate result of the ITP's retaliatory discharge, Lyssenko has been damaged, including lost income.   Lyssenko has also suffered severe emotional distress, outrage, humiliation, and anxiety, as well as the disruption of his personal life.

WHEREFORE, Plaintiff, Taras Lyssenko, prays that this Court enter judgment in his favor and against Defendant, International Titanium Powder, LLC, for compensatory damages in an amount to be determined at trial, for punitive damages in an amount in excess of $5 million plus costs, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count III:  Defamation *Per Se* Against ITP

64.   Lyssenko repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 41 as if fully restated.

65.   ITP intentionally made false and *per se* defamatory statements about Lyssenko to third parties, including original equipment manufacturers ("OEMs") and government officials.

66.   For example, in September 2007, ITP's agent and CEO Borys told an OSD representative that Lyssenko "burned bridges" within the government and implied that ITP terminated Lyssenko for that reason.

67.   This statement is *per se* defamatory because it suggests that Lyssenko is unable to perform as a lobbyist and lacks integrity as a lobbyist because he "burned bridges" throughout the government.

68.   This statement also is false and not otherwise privileged.

69.   As a direct and proximate result of the defamatory statements, Lyssenko has been damaged financially and has suffered severe emotional distress, outrage, humiliation, and anxiety, as well as the disruption of his personal life.

70.    Unless ITP is enjoined from continuing to make such false defamatory statements, Lyssenko will continue to suffer immediate, substantial and irreparable harm, including the potential loss of current and prospective clients, loss of goodwill, reduction in his competitive position in the industry, and other economic damages.

WHEREFORE, Plaintiff, Taras Lyssenko, prays that this Court enter judgment in his favor and against Defendant, International Titanium Powder, LLC, for compensatory damages in an amount to be determined at trial, for punitive damages in the amount in excess of $5 million, for injunctive relief to prevent ITP from making further false and defamatory statements regarding Lyssenko to others, costs, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count IV: Defamation *Per Se* Against Borys

71.    Lyssenko repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 41 as if fully restated.

72.    Borys intentionally made false and *per se* defamatory statements about Lyssenko to third parties, including original equipment manufacturers ("OEMs") and government officials.

73.    For example, in September 2007, Borys told an OSD representative that Lyssenko "burned bridges" within the government and implied that ITP terminated Lyssenko for that reason.

74.    This statement is *per se* defamatory because it suggests that Lyssenko is unable to perform as a lobbyist and lacks integrity as a lobbyist because he "burned bridges" throughout the government.

75.    This statement also is false and not otherwise privileged.

- 13 -

76.    As a direct and proximate result of the Borys' defamatory statements, Lyssenko has been damaged financially and has suffered severe emotional distress, outrage, humiliation, and anxiety, as well as the disruption of his personal life.

77.    Unless Borys is enjoined from continuing to make such false and defamatory statements, Lyssenko will continue to suffer immediate, substantial and irreparable harm, including the potential loss of current and prospective clients, loss of goodwill, reduction in his competitive position in the industry, and other economic damages.

WHEREFORE, Plaintiff, Taras Lyssenko, prays that this Court enter judgment in his favor and against Defendant, Stanley Borys, for compensatory damages in an amount to be determined at trial, for punitive damages in the amount in excess of $5 million, for injunctive relief to prevent Borys from making further false and defamatory statements regarding Lyssenko to others, costs, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Jury Demanded

Lyssenko demands a trial by jury of all issues triable by a jury under Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

TARAS LYSSENKO

By: /s/    Gia F. Colunga
One of His Attorneys

- 14 -

Anthony J. Carballo
Gia F. Colunga
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606-6677
312.360.6000

Dated: June 11, 2008

1540752v1